2019 IL App (4th) 170646

NO. 4-17-0646

FILED
August 27, 2019
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| ELLIOTT T. MURPHY, | ) | No. 09CF1471 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Presiding Justice Holder White and Justice Turner concurred in the judgment and
opinion.

**OPINION**

¶ 1        In April 2017, a jury found defendant, Elliott T. Murphy, guilty of the first degree

murder of Jerry Newingham (720 ILCS 5/9-1(a)(1) (West 2008)) and the attempted first degree

murder of Kevin Wilson (*id.* §§ 8-4(a), 9-1(a)(1)). Defendant, who was 16 years old at the time

of the August 2009 offenses, was sentenced to consecutive terms of prison, totaling 55 years.

Defendant appeals his convictions and sentence.

¶ 2        On appeal, defendant argues (1) the State committed plain error by relying on the

prior inconsistent testimony given by Branden White as substantive evidence without sending the

transcripts of that testimony to the jury to prove White had so testified, (2) trial counsel was

ineffective for failing to present evidence in the second trial showing defendant was absent from

school on and around the date a key State witness, Malcolm Spence, claimed defendant made an inculpatory statement at school, and (3) his 55-year sentence for offenses he committed when he was only 16 years old was a *de facto* life sentence imposed in violation of federal and state authority. We agree with defendant's sentencing argument and remand.

¶ 3                                    I. BACKGROUND

¶ 4        On August 24, 2009, Jerry Newingham and Kevin Wilson encountered a group of teenage males that, according to the State's evidence, included defendant, defendant's 14-year-old brother Deonta Johnson, Dedrick Rhone, Fredrick Rhone, Malcolm Spence, and Branden White. Newingham, age 61, was riding his bike when he was attacked. After he fell to the ground, Newingham was stomped to death by members of the group. The assailants then attacked Wilson, who was lying near a park pavilion. Emergency personnel found Wilson bloody, swollen, and unable to walk or answer questions. Wilson survived the attack.

¶ 5        The State prosecuted the aforementioned juveniles as adults for the first degree murder of Newingham, the attempted murder of Wilson, and other charges. White entered a negotiated plea to first degree murder. In exchange for his plea and truthful testimony, White was sentenced to 20 years in the Illinois Department of Corrections (DOC). Spence pleaded guilty to mob action and obstruction of justice and agreed to testify truthfully. The charges of murder and attempted murder against Spence were dismissed. Fredrick and Dedrick entered open guilty pleas. Fredrick pleaded guilty to murder and was sentenced to 20 years. Dedrick pleaded guilty to attempted murder of Wilson and received 15 years.

¶ 6        Defendant and Johnson elected to be tried by a jury on the State's charges. In 2011, defendant and Johnson were tried jointly and found guilty of murder (Newingham) and

attempted murder (Wilson). At this trial, Spence testified regarding a conversation he had with defendant and Johnson:

"Q. I'm going to ask you some questions about a conversation that occurred about two days after this. Do you understand that? About two days after the attack?

A. Yes, ma'am.

Q. Did you have a conversation with [defendant]?

A. Yes, ma'am.

Q. And where were you when you had that conversation with him?

A. At school

Q. And what school did you go to at that time?

A. MacArthur High School.

Q. Did [defendant] also attend MacArthur High School?

A. Yes, ma'am.

Q. Is MacArthur High School located pretty much right next to Garfield Park?

A. No.

Q. When you spoke to [defendant], was anybody else present?

A. Yeah.

Q. Who else was there?

- 3 -

A. His brother and a couple other people.

Q. When you say, 'his brother,' who[m] are you referring to?

A. Deonta.

Q. Okay, and Deonta Johnson?

A. Yes, ma'am.

Q. What did [defendant] say to you during that conversation?

A. He told me what happened to the dude that got jumped on at Monroe.

Q. And when you say that he told you what happened to the dude that was jumped on at Monroe, what did he say[ ] specifically happened?

A. Said they was just walking and he was riding his bike and he told his brother to go swing on him.

* * *

Q. And what did he say next?

A. He said his brother swung on him and they all just got to jumping on him.

* * *

Q. Did you also have a conversation with Deonta Johnson?

A. Yes, ma'am.

Q. And was it the same time you talked to [defendant] or was it a different conversation?

A. Same time.

Q. Was [defendant] present when you talked to Deonta Johnson?

A. Yes, ma'am.

Q. And was that also at MacArthur High School?

A. Yes, ma'am.

Q. And what did Deonta Johnson say to you?

A. He told me he didn't know if he could do it. So, he just said he did it.

* * *

Q. What was he talking about?

A. Knocking the man off his bike."

¶ 7 On cross-examination, defense counsel questioned Spence regarding the alleged conversation:

"Q. You stated that a couple of days afterward, you had a conversation at school that involved [defendant] and Mr. Johnson and some other people?

A. Yes, sir.

Q. At MacArthur?

A. Yes, sir.

Q. And at like lunch time or something?

A. Yes, sir."

¶ 8         To impeach Spence's testimony, defense counsel introduced defendant's attendance records for the dates of August 24 through September 3, 2009. The records are not included on appeal. Both defendant and the State addressed the records during closing argument. Defense counsel argued the school records demonstrate Spence's conversation with defendant did not occur:

> "Spence tells us about this mythical conversation that he had with both of the defendants two days after the attack, and I say mythical because it occurred, according to him, at MacArthur School in the cafeteria around lunch time. He said that that's a school that Mr. Johnson didn't attend. He wasn't in MacArthur, and that's a school that Mr. Murphy, and you'll see this from the exhibits that we stipulated to at the end of the trial, was absent on both [*sic*] the 26th, 27th, and 28th. So, Mr. Spence testified that he had this conversation where the defendants made statements on an occasion when it couldn't have happened. I would submit that Mr. Spence's credibility is zero."

In contrast, the State, in closing, argued the school records did not undermine Spence's testimony, but showed defendant had been suspended from school on the date of the offenses:

> "There were also school records, as the defendant's exhibit in this case, that you will see back in the jury room and it shows

that [defendant] was not in school in the days that followed this offense when Malcolm Spence spoke to him where he talked about what he had done to the victim on Sawyer Street. Well, please note, when you take that exhibit back in the jury room, that the defendant *** wasn't in school on August [24, 2009,] either. He had a school suspension. He was not in school that day, and that's the day that this murder occurred and yet he is on the property of MacArthur High School with his brother who goes to the middle school right when that school lets out because they're there from the very beginning when Brian Armour and Dedrick Rhone fight. So, the fact that he's not in school does not mean he couldn't have been on the premises. We know that he was on August [24, 2009]."

¶ 9 The jury found defendant guilty of both first degree murder and attempted murder. Defendant appealed his convictions. On appeal, this court concluded defendant was entitled to summary reversal and a new trial due to "trial counsel's *per se* conflict of interest in contemporaneously representing defendant and [a witness]." *People v. Murphy*, 2013 IL App (4th) 111128, ¶ 79, 990 N.E.2d 815.

¶ 10 In April 2017, on remand, defendant's second jury trial was held. Defendant's trial was lengthy and involved a number of witnesses. For this appeal, we will summarize the testimony of those witnesses necessary to resolve the issues raised by defendant.

¶ 11 At retrial, Spence was called upon by the State to testify regarding the attack on

Wilson and his conversation with defendant. Spence agreed the conversation occurred "a couple—two days after that happened in Garfield Park." Spence testified he was at school and "[e]verybody was up there." According to Spence, defendant said, "they had jumped on somebody before they came up to the park," and defendant said he told his younger brother Johnson to punch him. Defendant also said he stomped on the man's head.

¶ 12   On cross-examination, defense counsel asked questions emphasizing Spence told the police the "story that you told today" only after having been charged with murder and attempted murder. Defense counsel further emphasized the charges against Spence had been dropped. Defense counsel did not seek to admit school records.

¶ 13   Also during retrial, the State called Branden White to testify. White testified in defendant's 2011 trial. White acknowledged he, six years earlier, pleaded guilty to the first degree murder of Newingham. As part of his plea, White was sentenced to 20 years' imprisonment in exchange for his truthful testimony. The State asked White if he testified at a hearing on this matter in August 2011. White responded he did not remember. White also did not remember attending MacArthur High school in Decatur on August 24, 2009. White knew defendant and refused to describe an item defendant was wearing. White, however, identified defendant in a photo as formerly "[m]y main man." The State asked White if he gave testimony at his sentencing hearing on April 4, 2011. Defendant stated he did not remember. The State referred to People's Exhibit No. 25 as a transcript of that proceeding. The State then questioned White as follows:

> "Q. Were you asked this question and did you give this
>
> answer on page 2, line 14 to 16: 'Q: On August 24, 2009, were you

present on 500 West Sawyer Street in the afternoon hours? A: Yes, ma'am.'?

A. You want me to answer yes, ma'am?

Q. Were you present and did you give that answer?

A. I don't remember.

Q. And, in fact, were you asked page 2, line 17 to 24: 'Q. And was Deonta Johnson also present? A: Yes, ma'am. Q: Was [defendant] also present? A: Yes, ma'am. ***.' Were you asked those questions and did you give that answer on April 4, 2011?

A. I don't remember.

* * *

Q. And did Deonta Johnson hit [Jerry Newingham] and he [fell] off his bike?

A. I don't remember.

* * *

Q. And[,] for counsel, the April 4 transcript, it's page 3, lines 8 through 13. Were you asked this question: 'Q: Did you observe [defendant] kick and strike Jerry Newingham? A: Yes, ma'am. Q: Specifically, did [defendant] primarily kick and stomp on the head of Jerry Newingham? A: Yes, ma'am.' Were you asked those questions on April 4, 2011[,] and did you give [ ] those answers?

- 9 -

A. I don't remember.

* * *

Q. On April 4, 2011, did you say that you heard [defendant] bragging about what he did to Mr. Newingham?

A. I don't remember.

Q. For counsel, it's pages 4 and 5, lines 22 through 24 and 1 through 7. Do you recall being asked this question and giving these answers: 'Q. After Jerry Newingham was attacked, did you hear [defendant] bragging about stomping on Jerry Newingham's head? A: Yes, ma'am. Q: And what did he say to the best of your recollection? A: That he had stomped him, like, 30 times, something like that.' Then the Court said to you, 'could you speak up, say that again' and you said that he stomped him like 30 times. Do you recall being asked those questions and giving that answer?

A. No. I don't remember.

* * *

Q. And on April 4, 2011, did you say that you saw Kevin Wilson being attacked at Garfield Park?

A. I don't remember.

* * *

Q. For counsel, it's page 6, lines 9 through 10—I'm sorry—lines 5 through 8: 'Q: No. But I'll rephrase that. Did you

observe individuals physically attack Kevin Wilson at Garfield Park? A: Yes, ma'am.' Were you asked that question and did you give that answer?

A. I don't remember.

Q. And on April 4, 2011, you said that [defendant] was involved; isn't that correct?

A. I don't remember.

Q. And for counsel, page 6, lines 9 and 10. Were you asked this question: 'Q: And was [defendant] involved in that attack? A: Yes, ma'am.' Did you give that answer?

A. I don't remember.

Q. And on April 4, 2011, did you say that [defendant] used both feet to jump on Mr. Wilson?

A. I don't remember.

Q. For counsel, same page, lines 11 through 15. Were you asked these questions and did you give this answer: 'Q: And at one point, did he jump on Kevin Wilson's head with both feet? A: Yes, ma'am. Q: And you saw that? A: Yes, ma'am.' Were you asked those questions and did you give that answer?

A. I don't remember."

The State also questioned White regarding his testimony from defendant's first trial:

"Q. I'm going to mark a transcript, partial transcript, from

- 11 -

August 12, 2011[,] as People's Exhibit No. 26. For counsel, it is page 9, lines 18 through 24. Were you asked this question and did you give this answer: 'Q: And when you say, "not at first," did something happen or did you hear something that caused you then to see this older man—older white male on the bike? A: He fell of [*sic*] *his* bike. Q: And you say "he fell of [*sic*] his bike." Did you see what happened to cause him to fall of [*sic*] his bike? A: He got punched.' Continuing on page 10, lines 1 through 4: 'Q: And who punched him? A: Deonta. Q: Deonta? A: Yeah.' Were you asked those questions and did you give those answers?

A. I don't remember.

Q. Did your main man, [defendant], participate in the beating of Jerry Newingham by stomping on his head?

A. (Laughing) I don't remember.

\* \* \*

Q. Hmmm. And on August 12, 2011, were you asked this question and did you give this answer? For counsel, it's page 11, lines 10 through 21: 'Q: So when you're all there on Sawyer Street and you see Deonta Johnson punching the man, knocking him off his bike, what do you see next? A: Elliott and Fred stomp him and Deonta. Q: You say you saw Elliott and that's [defendant], correct? A: Yes.' Is there something else going on that's got your attention?

A. No. Just looking for the time.

Q. 'A: Yes. Q: Do you see—you see him stomping the man? A: Yes. Q: Do you recall what part of the man's body you saw [defendant] stomping? A: His head. Q: Where is the man— you say you knocked him off his bike—where is the man laying [*sic*] at the time the stomping is going on? Do you recall how he was positioned on the ground? A: No.' Were you asked those questions and did you give those answers?

A. I don't remember."

¶ 14        Defense counsel stipulated to the accuracy of the exhibits. Plaintiff's Exhibits 25 and 26 were admitted into evidence.

¶ 15        At the close of the evidence, the State's argument referenced White's testimony from his plea hearing and defendant's first trial. The State highlighted White testified defendant stomped on Wilson's head and on Newingham's head "more than five times with a great deal of force." The jury found defendant guilty of both first degree murder and attempted first degree murder.

¶ 16        At sentencing, the trial court observed defendant was 16 years old at the time of the offense. The court observed defendant "was mature enough and should have known what the risk and consequences of this behavior was." The court found defendant was not pressured to commit the offenses. Regarding the potential for rehabilitation, the court concluded the following: "Of course, when this incident happened, he was young. So[,] certainly, there is potential for rehabilitation in the future." The court sentenced defendant to consecutive terms of

40 years' imprisonment for first degree murder and 15 years' imprisonment for attempted first degree murder.

¶ 17    In his motion to reconsider, defendant argued his sentence was too harsh given his age and his minimal history of criminality. In deciding to deny the motion to reconsider, the trial court, in August 2017, made the following remarks:

> "Of course, the Court did consider factors in aggravation and mitigation, the statutory ones, along with the Court also considered the defendant's age, his level of maturity, outside pressures, home environment, his potential for rehabilitation, the circumstances of this offense, his degree of participation, his prior record. So[,] when I considered all of the statutory factors and what actually occurred in this, I believe that a sentence of 40 years to the [DOC] for the first degree murder was an appropriate sentence. I believe a consecutive 15 years for the attempt[ed] first degree murder was also an appropriate sentence in this case. Of course, it's mandatory that they be consecutive sentences. So[,] I believe that a sentence of 55 years to the [DOC], based on the facts and circumstance[s] and all the other statutory factors, was appropriate."

¶ 18    This appeal followed.

¶ 19                    II. ANALYSIS

¶ 20    A. The State's Failure to Send a Copy of the Transcripts of Branden White's Prior

- 14 -

Testimony to the Jury

¶ 21    Defendant argues the State committed plain error by relying on Branden White's prior inconsistent testimony as substantive evidence by not proving to the jury White had given that testimony. Defendant contends, although transcripts of White's testimony at White's sentencing hearing and at defendant's first trial (People's Exhibits 25 and 26) were admitted into evidence, those exhibits were not published to the jury during trial or during deliberations. Defendant emphasizes the State pointed to White's earlier testimony repeatedly during closing argument, despite not presenting the content of that testimony to the jury. According to defendant, the State's reliance on evidence not presented to the jury was clear and obvious error, impacting his right to a fair trial, and because the evidence was closely balanced, he is entitled to a new trial, despite his failure to raise the issue before the trial court.

¶ 22    The State counters, in part, by emphasizing the jury was informed of defendant's prior sworn testimony. The State points to Branden White's testimony in this trial, where the prosecutor read from the transcripts during questioning.

¶ 23    The plain error doctrine allows a court of review to provide relief from errors occurring during trial that were forfeited when not brought to the trial court's attention. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). Under the doctrine, a reviewing court may consider an unpreserved error in one of the following circumstances:

> "(1) a clear or obvious error occurred and the evidence is so
> closely balanced that the error alone threatened to tip the scales of
> justice against the defendant, regardless of the seriousness of the

error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410 (2007).

¶ 24 The first step in this analysis is determining whether clear or obvious error occurred. See *id.* The burden of establishing a clear or obvious error is on defendant. *People v. Reese*, 2017 IL 120011, ¶ 72, 102 N.E.3d 126. We are mindful the doctrine should be invoked only when the record clearly shows an error affecting substantial rights was committed. *Id.*

¶ 25 Defendant's claimed error is the State relied in closing argument on "evidence" not presented to the jury. However, as the State argues, the jury was presented the evidence during White's testimony, even though it was not handed the transcripts. The transcripts from White's testimony at his own sentencing hearing and at defendant's first trial were offered to the trial court and admitted as evidence. Before the court's admission of those transcripts, defense counsel conceded their accuracy. Thus, while White testified, the jury heard the State identify the relevant lines and pages of the transcripts and read White's earlier statements from that evidence. Defendant has not established that the State's closing argument referencing White's prior testimony, based on evidence admitted at defendant's trial and evidence read to the jury, amounts to clear or obvious error.

¶ 26 Defendant's primary case on this issue, *People v. Jones*, 173 Ill. App. 3d 147, 527 N.E.2d 441 (1988), is distinguishable. In *Jones*, the prosecutor argued improperly the witness's prior statement "must have been consistent with his trial testimony based on the prosecutor's

personal knowledge of the content of the prior statement." *Id.* at 151. Unlike in this case, the *Jones* witness's prior statement was not entered into evidence.

¶ 27 Defendant counters the State's argument is unconvincing on multiple grounds, the first of which was the State's failure to cite "law governing prior inconsistent statements under 725 ILCS 5/115-10.1(b) (2017)." Defendant argues a party may not introduce a prior inconsistent statement by merely asking the witness if he or she gave prior testimony and eliciting the response the witness did not remember. Defendant maintains, citing *People v. Evans*, 2016 IL App (3d) 140120, ¶¶ 33-35, 60 N.E.3d 77, when White stated he could not recall making the statement, the State was required to offer evidence of the statement. It is, according to defendant, improper for the State to simply read the question.

¶ 28 This argument fails to recognize the State did offer evidence of the statement— the transcripts from the hearings in which White made the statements under oath. Even defendant's own case law, *Evans*, recognizes "if the proper foundation had been laid, [the witness's] prior trial testimony made under oath could have been admitted substantively as an 'inconsistent' statement to [the witness's] response that he did not remember if he was with defendant on the day of the murder." *Id.* ¶ 35. The *Evans* court then emphasized the prosecutor did not offer any substantiating proof of the inconsistent statement to complete the impeachment. *Id.* ¶ 36. The State met those requirements here. The jury heard the contents of the substantiating proof.

¶ 29 Defendant next contends the State's argument "fails to appreciate the distinction between admitting evidence to the court and presenting that evidence to the jury." However, defendant fails to cite any authority that requires documentary evidence be delivered to the jury

room in order to become evidence. The case law defendant cites only supports the proposition that a defendant may not suffer prejudice if a piece of documentary evidence, with overly prejudicial material not seen or heard by the jury, is not sent to the jury room. See, *e.g.*, *Reese*, 2017 IL 120011, ¶¶ 67, 72 (finding no prejudice when the defendant could not prove the jury saw the certified copy of defendant's prior murder conviction that allegedly contained excessive and irrelevant details); see also *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 65, 2 N.E.3d 642 (finding the jury did not hear the complained-of evidence as "the State fast-forwarded" parts of the interview and the record did not indicate what sections were provided to the jury).

¶ 30       Defendant has not met his burden of proving clear or obvious error occurred. He cannot establish plain error.

¶ 31              B. Defendant's Claim of Ineffective Assistance of Counsel

¶ 32       Defendant next argues he was denied the effective assistance of counsel when counsel failed to present evidence showing defendant was absent from school on and around the date Spence testified defendant made an inculpatory statement at school. Defendant asserts Spence testified that, two days after the offenses, he and defendant were at school when defendant admitted his involvement in Newingham's murder. In the first trial, defense counsel undermined this testimony with school records indicating defendant was absent from school on the date the conversation occurred. In the second, however, defense counsel did not offer the evidence. Defendant maintains the decision was not objectively reasonable and the admission of the inculpatory statement without challenge by defense counsel prejudiced him, warranting a new trial. Defendant acknowledges the records also show defendant was suspended from school on the date of the murder but contends a decision by counsel to forgo introducing the school

records to undermine an inculpatory statement to avoid admitting evidence of a prior bad act was not a strategic decision reasonable defense counsel would make.

¶ 33 In contrast, the State initially argues this court should decline to address defendant's claim, as it would be better presented in postconviction proceedings where a full record could be presented. The State maintains because the exact nature and content of the school records from defendant's first trial are not in the record, any assessment as to trial counsel's representation would be speculative.

¶ 34 To prevail on a claim of ineffective assistance of counsel, defendant must show both the performance of counsel was deficient and the deficient performance prejudiced him. *People v. Peel*, 2018 IL App (4th) 160100, ¶ 39, 115 N.E.3d 982. To show deficient performance, defendant must establish counsel's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). There is a strong presumption the challenged action or inaction was the product of sound trial strategy and not incompetence. *People v. Haynes*, 192 Ill. 2d 437, 473, 737 N.E.2d 169, 189 (2000); see also *Peel*, 2018 IL App (4th) 160100, ¶ 39 ("Mistakes in trial strategy or tactics do not necessarily render counsel's representation defective."). A defendant, however, may overcome that presumption if counsel's strategy choice "appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. King*, 316 Ill. App. 3d 901, 916, 738 N.E.2d 556, 568 (2000).

¶ 35 In general, in Illinois, a defendant must raise a constitutional claim of ineffective assistance of counsel on direct review or risk forfeiting the claim by not doing so. *People v.*

*Veach*, 2017 IL 120649, ¶ 47, 89 N.E.3d 366. Such claims are, however, better suited for collateral proceedings when the record is incomplete or inadequate to resolve the claim. *Id.* ¶ 46.

¶ 36     In this case, the record is inadequate to resolve defendant's ineffectiveness claim. We do not know the reason, if any, defense counsel did not use the school records in the second trial. We do not have the school records. What we know from the first trial is defendant was absent from school on August 24, 26, 27, and 28, and defendant was absent from school on at least one of those days due to a suspension. A reasonable inference is defendant was not absent from school on August 25, 2009, the day after the murder. In addition, Spence's testimony, through imprecise questions by the State and defense counsel, was indefinite as to the time and place of the conversation. What we know from Spence's testimony is that the inculpatory statement occurred "about two days after the attack." The conversation occurred "[a]t school" and "at like lunch time or something." Because the questions by counsel did not pin down Spence to a specific time or place, what we know about the school records has little to no effect in undermining the inculpatory statement that occurred. At the first trial, defense counsel argued the school records showed the statement, which occurred in the cafeteria on a day defendant was not at school, establishes the statement did not occur. However, the vague testimony shows the conversation occurred anywhere on the school grounds at any point in the day "about two days" after the murder, which would include August 25, 2009, when defendant was not absent from school. In addition, Spence testified Deonta Johnson was present during the conversation "at school" when it occurred. The record shows testimony Johnson attended the junior high, which was next door to the high school, leading to the inference the statement occurred on school grounds and not in the cafeteria, as defense counsel argued in the first trial. Thus, the fact

defendant was not in class does not mean the conversation could not have occurred, leading defense counsel to decide whether to allow the jury to hear of defendant's prior bad act with little impact on the inculpatory statement.

¶ 37        Defendant argues a decision to forgo using the school records to undermine the inculpatory statement is "unsound." Defendant contends "any negative inferences that the jury could make from that suspension paled in comparison to the evidence of [defendant's] alleged inculpatory statements that the school records would have rebutted." According to defendant, "[t]he latter served as direct evidence to corroborate [defendant's] guilt in the charged crimes, while the former merely showed [defendant] had violated a school rule."

¶ 38        This argument is unpersuasive. In addition to the low impeachment value due to the questions posed to Spence, the absence of records prevents us from knowing the school rule defendant violated. If the rule violated by defendant involved fighting, inciting a fight, or lying, a decision by defense counsel to forgo delving into these matters before the jury would, in these circumstances, seem reasonable. If the violated school rule involved a minor matter such as tardiness, the question may be closer. The record is inadequate to resolve this question. It is better for defendant to reserve this claim for a collateral proceeding, where school records and other evidence may be considered. See, *e.g.*, 725 ILCS 5/122-2 (West 2018) (authorizing the attachment of records or other evidence to support postconviction claims).

¶ 39                                C. Sentencing

¶ 40        Defendant last argues his 55-year sentence for crimes he committed when he was 16 years old is a *de facto* life sentence in violation of federal and state authority. His first argument on this issue is his sentence violates the eighth amendment's prohibition against cruel

and unusual punishment. Defendant, citing *Montgomery v. Louisiana*, 577 U.S. ___, ___, ___, 136 S. Ct. 718, 726, 733-34 (2016), asserts the eighth amendment allows a sentence of life imprisonment without parole for only "the rarest of children" who are permanently incorrigible and possess "such irretrievable depravity that rehabilitation is impossible." According to defendant, the trial court's finding defendant possessed rehabilitative potential foreclosed his *de facto* life sentence.

¶ 41　　　　The State disagrees. Initially conceding, under *People v. Buffer*, 2019 IL 122327, ¶¶ 36-42, defendant's 55-year sentence is a *de facto* life sentence, the State argues a juvenile may be given a *de facto* life sentence if the sentencing court first considers the defendant's youth and its attendant characteristics, which was done here. The State concludes the trial court complied with the law in considering these factors and, therefore, could properly sentence defendant to life.

¶ 42　　　　It is by now well established "youth matters in sentencing." *People v. Holman*, 2017 IL 120655, ¶ 33, 91 N.E.3d 849. In *Miller v. Alabama*, 567 U.S. 460, 474 (2012), the United States Supreme Court held states may not impose their "most severe penalties on juvenile offenders *** as though they were not children" and concluded mandatory life sentences without the possibility of parole for juveniles violate the eighth amendment's prohibition against cruel and unusual punishment. The *Miller* Court noted three important ways children constitutionally differ from adults for sentencing purposes: (1) children are less mature than adults and possess an underdeveloped sense of responsibility, (2) children are more vulnerable than adults to negative influence and pressure from peers and family, and (3) the character of a child is less fixed, meaning the conduct of the child is less likely indicative of irretrievable depravity. *Id.* at

- 22 -

471; see *People v. Harris*, 2018 IL 121932, ¶ 55, 120 N.E.3d 900.

¶ 43        While finding mandatory sentences of life imprisonment without the possibility of parole for a juvenile are prohibited, the *Miller* Court acknowledged the harshest penalty may be appropriate. However, it cautioned, "given all we have said in *Roper* [*v. Simmons*, 543 U.S. 551, 573 (2005)], *Graham* [*v. Florida*, 560 U.S. 48, 68 (2010)], and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Miller*, 567 U.S. at 479. Later, in *Montgomery*, which held *Miller* applied retroactively, the Court observed *Miller* established life without parole is justified when a sentencing court "encounter[s] the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible." *Montgomery*, 577 U.S. at ___, ___, 136 S. Ct. at 733, 736.

¶ 44        The Supreme Court of Illinois has interpreted *Miller* and *Montgomery* as allowing a juvenile to be sentenced to life without parole if the sentencing court finds "the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. The *Holman* court found a sentencing court may make such a finding upon considering the juvenile's youth and youth's attendant characteristics. The attendant characteristics include, but are not limited to, the following factors referred to as the *Miller* factors (see *id.* ¶¶ 43, 45):

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile

- 23 -

defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

¶ 45        Since *Miller*, our General Assembly enacted section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)), mandating a sentencing court to consider specific factors before imposing a sentence on individuals under 18 at the time of the offense. Section 5-4.5-105 is not limited to individuals whose offenses have exposed them to a possible life sentence. The section 5-4.5-105 factors are similar to those in *Miller*:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

- 24 -

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.* § 5-4.5-105(a)(1)-(9).

See also *Holman*, 2017 IL 120655, ¶ 45 (observing "consideration of the *Miller* factors is consistent with section 5-4.5-105").

¶ 46    *Miller*'s holding has been extended to include life sentences imposed at the trial court's discretion (*id.* ¶ 40) and sentences that are *de facto* life sentences, *i.e.*, sentences that cannot be served in a lifetime (*People v. Reyes*, 2016 IL 119271, ¶ 9, 63 N.E.3d 884). Recently, the supreme court defined a *de facto* life sentence for juveniles as one of more than 40 years. See *Buffer*, 2019 IL 122327, ¶¶ 39-42. As the State acknowledges, defendant's 55-year sentence is a *de facto* life sentence.

¶ 47    The State's position focuses too narrowly on the list of factors in *Holman* and on

the factors of section 5-4.5-105. This approach plainly ignores the language preceding *Holman*'s list of factors and establishing that a life sentence without parole is permissible "only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" *after* an examination of youth and its attendant characteristics. *Holman*, 2017 IL 120655, ¶ 46. Only after consideration of youth and its attendant circumstances, as in the *Miller* factors or those in section 5-4.5-105, *and* a finding of "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" (*id.*) will the eighth amendment's bar against cruel and unusual punishment yield to a *de facto* life sentence without possibility of parole for a juvenile. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 733 (concluding *Miller* establishes life without parole is justified when a sentencing court "encounter[s] the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible"). Tellingly, the supreme court's analysis in *Holman* is consistent with this interpretation of the law. The *Holman* court affirmed the juvenile's life sentence upon examination of the trial court's analysis of the *Miller* factors and a showing "defendant's conduct placed him beyond rehabilitation." *Holman*, 2017 IL 120655, ¶ 50.

¶ 48        Here, the life sentence followed an express finding defendant possessed rehabilitative potential. The determination defendant, a juvenile, had the potential to rehabilitate contravenes any conclusion defendant was permanently incorrigible or irretrievably depraved and is, therefore, unconstitutionally at odds with a *de facto* life sentence without parole for a juvenile offender. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 733 ("Rehabilitation cannot justify the sentence, as life without parole 'forswears altogether the rehabilitative ideal.' "

- 26 -

(quoting Miller, 567 U.S. at 473)). Defendant's *de facto* life sentence, imposed after a finding defendant possessed rehabilitative potential, violates the eighth amendment's ban against cruel and unusual punishment. Defendant must be resentenced.

¶ 49         III. CONCLUSION

¶ 50    We affirm defendant's convictions. We vacate defendant's sentence and remand for resentencing.

¶ 51    Affirmed in part, vacated in part, and remanded.