2022 IL App (4th) 200565-U

NOTICE
This Order was filed under
Supreme Court Rule 23 and is not
precedent except in the limited
circumstances allowed under Rule
23(e)(1).

NO. 4-20-0565

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 9, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| ELLIOTT T. MURPHY, | ) | No. 09CF1471 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding defendant's postconviction petition was
             frivolous and patently without merit where defendant failed to present the gist of a
             constitutional claim of ineffective assistance of appellate counsel.

¶ 2        In April 2017, at his second jury trial, a jury found defendant, Elliott T. Murphy,

guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) and attempt (first degree

murder) (*Id.* §§ 8-4(a), 9-1(a)(1)).

¶ 3        In August 2020, defendant filed a petition for postconviction relief, alleging, in

part, his appellate counsel was ineffective for failing to raise a claim under *Batson v. Kentucky*,

476 U.S. 79 (1986), on direct appeal. The trial court dismissed defendant's petition as frivolous

and patently without merit.

¶ 4         On appeal, defendant argues the trial court erred in dismissing his postconviction petition where he presented the gist of a claim appellate counsel provided ineffective assistance when she failed to bring his viable claim under *Batson* on direct appeal. We disagree and affirm.

¶ 5                                    I. BACKGROUND

¶ 6         This court has set forth the underlying facts of this case on defendant's direct appeals. See *People v. Murphy*, 2022 IL App (4th) 200249-U; see also *People v. Murphy*, 2019 IL App (4th) 170646, 145 N.E.3d 56; *People v. Murphy*, 2013 IL App (4th) 111128, 990 N.E.2d 815. Accordingly, we will set forth only those facts necessary to resolve the issue presented in this case.

¶ 7                                  A. First Jury Trial

¶ 8         In September 2009, the State charged defendant and several other persons with first degree murder (720 ILCS 5/9-1(a)(1) (West 2008)), attempt (first degree murder) (*id.* §§ 8-4(a), 9-1(a)(1)), aggravated battery (*id.* § 12-4(a)), robbery (*id.* § 18-1), and mob action (*id.* § 25-1(a)(1)). The charges arose out of two incidents that took place in Decatur on August 24, 2009, when defendant was 16 years old. In the first incident, a group of teenage boys, including defendant, battered and fatally injured Jerry Newingham near 540 West Sawyer Street. The second incident occurred shortly thereafter, in which they battered and severely injured Kevin Wilson in nearby Garfield Park. Because defendant was 16 at the time of the attacks and hence, was over the statutory age of 15, the State prosecuted him in adult criminal court pursuant to section 5-130(1)(a) of the Juvenile Court Act of 1987 (705 ILCS 405/5-130(1)(a) (West 2008)).

¶ 9         After a trial, the jury found defendant guilty of both first degree murder and attempted murder. Defendant appealed his convictions. On appeal, this court concluded defendant was entitled to summary reversal and a new trial due to "trial counsel's *per se* conflict

of interest in contemporaneously representing defendant and [a witness]" during the pretrial phase of defendant's case. *Murphy*, 2013 IL App (4th) 111128, ¶ 79.

¶ 10                                    B. Second Jury Trial

¶ 11        In April 2017, on remand, the trial court conducted defendant's second jury trial. The jury venire consisted of 34 potential jurors. The precise racial makeup of the venire is unknown. Potential jurors were examined in groups of 14.

¶ 12                    1. *Examination of the First Group of Potential Jurors*

¶ 13        During examination of the first group, the trial court listed the potential witnesses. Potential juror Palmer stated she "might" know defendant's family and she knew some of the potential witnesses or their parents. Palmer explained she knew the parents of witnesses Brian Armour, Malcom Spence, and Martin Wheeler, but she did not think it would affect her ability to act as a juror. When asked if she would "have to explain [her] verdict in any way to anybody," Palmer responded, "Yes." Palmer clarified she "wouldn't want any hard feelings," but agreed she could "put that aside and *** just decide the case on the evidence." Palmer further clarified when examined by the State she would need to explain her verdict to defendant's mother if she ran into her and it would "make [her] uncomfortable," but Palmer also stated it "would not impact [her]."

¶ 14        Prospective jurors DeVivo, Knierim, and Waller disclosed they were "casual acquaintances" with some of the witnesses.

¶ 15        The State asked prospective jurors whether, due to defendant's age, they would "hold the state to a higher standard of proof than beyond a reasonable doubt." Prospective juror Allen responded, "Yes." The following colloquy occurred:

"Q. Okay. Let me just make sure that I got that right. Our burden of proof is to prove the case beyond a reasonable doubt. Because [defendant] was 16, do you think you'd make us prove something more than beyond a reasonable doubt?

A. No.

Q. Okay. Then you said no for the record, right?

A. Yes."

Prospective juror Palmer stated she knew how easily her 14-year-old son had been influenced by friends and responded affirmatively she would hold the State to a standard higher than beyond a reasonable doubt. All other jurors responded negatively.

¶ 16    The State asked prospective jurors, "Have you, a close friend or family member ever been accused of a violation of the law?" Seven of the fourteen jurors responded affirmatively but agreed the incidents would not influence them during trial.

¶ 17    The State asked the panel, "Is there anything about you that would cause you hesitancy in judging the conduct of another person?" Juror Allen responded, "Not really." The State asked, "When you say, 'not really,' is that—are you iffy on that?" and Allen responded, "Yes." Juror Helm responded, "I can't 100 percent be sure" but agreed at the end of trial he would be able to determine whether defendant was guilty or not guilty.

¶ 18    After examination, two jurors were removed for cause. The State used peremptory challenges on jurors Allen, Helm, and Palmer. Allen and Palmer were Black. The defense used three peremptory challenges.

¶ 19        2. *Examination of the Second Panel of Prospective Jurors*

¶ 20    The examination of the second panel continued similarly to the first. Two jurors were dismissed for cause prior to full examination.

¶ 21　　　　When asked if they were acquainted with any potential witnesses or parties, jurors Burkham and Walker responded affirmatively. Burkham explained he was casually acquainted with several police officers listed as potential witnesses through his work. Walker explained he was a casual acquaintance of witness Brian Armour. Walker had also been introduced to defendant's mother through his father, who worked with defendant's mother.

¶ 22　　　　The State again asked prospective jurors whether, due to defendant's age, they would "hold the state to a higher standard of proof than beyond a reasonable doubt." Juror Slemp responded "Maybe." He clarified he was "concerned" because "[k]ids make stupid mistakes" and he was "struggling with it morally." Juror Walker asked for clarification as to the State's use of the term "allegedly committed" but ultimately responded he would not hold the State to a higher standard. Juror Burg stated she would have "a little harder time with it" and stated she "wouldn't like it, *** it's just [she] would have to do that."

¶ 23　　　　The State also asked prospective jurors, "Have you, a close friend or family member ever been accused of a violation of the law?" Eight of the jurors responded affirmatively. As to juror Taylor, she explained her son, "was at the wrong place at the wrong time. I think it was something like a kidnapping or something. He ended up getting probation out of it." Taylor agreed her son was treated "fairly and professionally" by the police. As to juror Walker, he stated he had a cousin in prison for armed robbery, but he did not attend court and did not believe Assistant State's Attorney Nichole Kroncke was involved in the case. All other jurors who responded affirmatively agreed the incidents would not influence them during trial.

¶ 24　　　　The State asked the panel, "Is there anything about you that would cause you hesitancy in judging the conduct of another person?" All the jurors on the panel answered

negatively. After juror Taylor responded negatively, the State asked, "And you hesitated a little bit. Were you thinking about it or?" and Taylor responded, "No. No, I don't. I'm good with it."

¶ 25          Two more jurors were removed for cause after examination. The State moved to use a peremptory challenge to remove juror Taylor, and defense counsel stated, "I'm starting to see a pattern here of them striking all black jurors." The trial court requested defense counsel make a *prima facie* case for a *Batson* challenge, and defense counsel argued the State had used three peremptory strikes to remove Black jurors. The court asked the State to give a race-neutral reason for excluding potential jurors Allen, Palmer, and Taylor.

¶ 26          As to juror Palmer, the State explained, "[S]he knew the defendant's mother. She said she would feel uncomfortable serving on a jury and she may know the parents of two of the witnesses." As to juror Allen, the State explained juror Allen "was hesitant on the age issue. She was also hesitant on whether or not she would have difficulty judging the conduct of another person. She said not really and never affirmatively stated she did not have [a] problem with that. Her answer was similar to Mr. Helm who, for the record, is a white male and we excused him for the same reason." As to juror Taylor, "she just stated that she had a son convicted of kidnapping when he was a young person. And there is a fear she may view defendant favorable because her son was in a similar situation." The State clarified as to juror Taylor, "Ms. Taylor's casual description of her son's conviction of kidnapping was as though it was not a very serious offense."

¶ 27          Defense counsel countered, arguing jurors Palmer and Allen rehabilitated themselves and stated they could be fair and impartial. Defense counsel also argued juror Taylor "didn't really say anything that should have raised a flag to have her stricken."

¶ 28    The trial court found the "reasons given by the State are race neutral." The court denied the *Batson* challenge.

¶ 29    *Voir dire* continued, and the State challenged potential jurors Walker and Burg for cause. Juror Walker was Black. The following exchange occurred:

"MR. BERRY [(DEFENSE COUNSEL)]: Again, you were—I'm seeing a pattern.

MS. KRONKE [(ASSISTANT STATE'S ATTORNEY)]: Our response to excuse [juror] Walker, that was the case I prosecuted and there was a heavily contested sentencing hearing where the entire family was present and upset with the sentence.

MS. KURTZ [(ASSISTANT STATE'S ATTORNEY)]: [Walker] would also know defendant's mother because she works with his father and he had discussions with [Walker] about allegedly—

THE COURT: —so you're moving to excuse who?

MS. KURTZ: Walker and Burg. We also, Judge, point out for the record that on this panel, we have excused two, but we have kept Mr. Phillips who is an African America[n] juror.

MR. BERRY: They have kept one out of four or five.

THE COURT: Mr. Berry, I will note your objection on the continuing Batson Challenge on this.

MS. KURTZ: If I could supplement: As to Ms. Palmer, I also want to make a record that she said she might have issue with the case because she has a 14-year[-]old and knows how easily kids that age are influenced easy.

- 7 -

THE COURT: I have raised the race neutral reasons and denied it. The

State has used six challenges; and Mr. Berry, you've used five challenges."

We note, although the State originally challenged Walker and Burg for cause, it was credited as using peremptory challenges. The defense used peremptory challenges on three jurors in the second panel.

¶ 30                             3. *Examination of the Third Panel*

¶ 31          The court and counsels examined the final panel substantially similar to the prior panels. The full panel was not needed to fill the remaining seats, so we only discuss the six jurors tendered to the parties. One of the jurors was casually acquainted with several potential physician witnesses.

¶ 32          After examination, one juror was dismissed for cause and the defense used one peremptory challenge, filling the remaining seats and alternate seats. The State did not use any peremptory challenges.

¶ 33                                 4. *Trial*

¶ 34          The jury found defendant guilty of both first degree murder and attempted first degree murder. Defendant filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. In the motion, defendant argued, in part, "the State systematically excluded Black jurors from the jury selection, with minimal reason, and over the Batson challenges made by the Defendant." In its response to defendant's motion, the State denied systematically excluding Black jurors and asserted a race-neutral reason was presented for each excused juror. The State also noted, "an African American male was selected by the State as a juror and served to the conclusion of this case." The trial court denied defendant's motion,

finding in relevant part "the State did not systematically exclude black jurors. They gave a race neutral reason for the excusal of any of the African Americans that were excluded."

¶ 35　　　　The trial court sentenced defendant to consecutive terms of 40 years' imprisonment for first degree murder and 15 years' imprisonment for attempted first degree murder. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 36　　　　　　　　　　　　　C. Direct Appeal

¶ 37　　　　Defendant filed a direct appeal, arguing (1) the State erred at trial by relying on prior inconsistent testimony as substantive evidence, (2) ineffective assistance of trial counsel for failing to present certain evidence contradicting a key State's witness at trial, and (3) defendant's sentence was an unconstitutional *de facto* life sentence. Appellate counsel did not raise a claim as to defendant's *Batson* challenge on direct appeal. This court determined defendant's sentence was unconstitutional, remanded for resentencing, and otherwise affirmed defendant's convictions. *Murphy*, 2019 IL App (4th) 170646, ¶ 50. Defendant was resentenced to consecutive terms of 31 years' imprisonment for first degree murder and 8½ years' imprisonment for attempted first degree murder. Defendant filed a new motion to reconsider sentence, which the trial court denied. Defendant appealed, and this court affirmed his sentence. *Murphy*, 2022 IL App (4th) 200249-U.

¶ 38　　　　　　　　　　　　D. Postconviction Petition

¶ 39　　　　On August 20, 2020, defendant filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). In his petition, defendant argued he (1) was denied the right to a public trial where a sign posted to the courtroom door reading "you may not enter when court is in session" stopped members of defendant's family from attending his jury trial, (2) received ineffective assistance of trial

counsel where counsel failed to object to the sign prohibiting entry when court was in session, (3) was denied due process and equal protection where the State used peremptory challenges to strike Black jurors, and (4) received ineffective assistance of appellate counsel when appellate counsel failed to (a) raise defendant's postconviction claims, including his *Batson* claim, on direct appeal and (b) file a petition for leave to appeal in the Illinois Supreme Court.

¶ 40        On October 20, 2020, the trial court entered a written order dismissing defendant's postconviction petition as frivolous and patently without merit.

¶ 41        This appeal followed.

¶ 42                            II. ANALYSIS

¶ 43        On appeal, defendant argues only his claim appellate counsel provided ineffective assistance on direct appeal by failing to raise his *Batson* claim presented the gist of a constitutional claim sufficient to advance his petition to the second stage.

¶ 44        The Act provides a mechanism for a criminal defendant to challenge his conviction or sentence based on a substantial violation of federal or state constitutional rights. *People v. Morris*, 236 Ill. 2d 345, 354, 925 N.E.2d 1069, 1074-75 (2010). Proceedings under the Act are collateral in nature and not an appeal from the defendant's conviction or sentence. *People v. English*, 2013 IL 112890, ¶ 21, 987 N.E.3d 371. Once defendant files a petition for postconviction relief, the trial court may, during the first stage of the proceedings, enter a dismissal order within 90 days if it finds the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2020). A petition is frivolous or patently without merit where it has "no arguable basis either in law or in fact, relying instead on an indisputably meritless legal theory or a fanciful factual allegation." (Internal quotation marks omitted.) *People v. Boykins*,

- 10 -

2017 IL 121365, ¶ 9, 93 N.E.3d 504. We review the trial court's summary dismissal of a postconviction petition *de novo*. *Id.*

¶ 45         Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. In the context of postconviction proceedings, "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced." (Emphasis added.) *People v. Hodges*, 234 Ill. 2d 1, 17, 912 N.E.2d 1204, 1212 (2009). "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175, 730 N.E.2d 32, 36 (2000). "Appellate counsel is not required to brief every conceivable issue on appeal *** and it is not incompetence for counsel to refrain from raising [meritless] issues." *People v. Edwards*, 195 Ill. 2d 142, 163-64, 745 N.E.2d 1212, 1224 (2001). "[U]nless the underlying issue is meritorious, a defendant cannot be said to have incurred any prejudice from counsel's failure to raise the particular issue on appeal." *Id.* at 164. Thus, we turn to whether defendant's *Batson* claim had merit.

¶ 46         In *Batson*, the United States Supreme Court established a three-step process for evaluating alleged discrimination in jury selection:

> "The Court held that the party objecting to the exercise of a peremptory challenge
> is first required to establish a *prima facie* case of purposeful discrimination 'by
> showing that the totality of the relevant facts gives rise to an inference of

discriminatory purpose.' [Citation.] If the objector demonstrates a *prima facie* case, the burden then shifts to the other party to explain his challenge by articulating a nondiscriminatory, 'neutral' explanation related to the particular case to be tried. [Citation.] Finally, the trial court considers the reasons provided for the peremptory strike. As part of that process, the objector may argue that the reasons given are pretextual. The trial court then makes a final determination as to whether the objector has established purposeful discrimination. [Citation.]"

*People v. Rivera*, 221 Ill. 2d 481, 500, 852 N.E.2d 771, 783 (2006) (quoting *Batson*, 476 U.S. at 93-94).

¶ 47 Under the second step, the State must articulate a race-neutral explanation. Race-neutral "means 'an explanation based on something other than the race of the juror.' " *People v. Davis*, 231 Ill. 2d 349, 363, 889 N.E.3d 238, 246-47 (2008) (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)). "In assessing an explanation, the trial court focuses on the *facial* validity of the prosecutor's explanation." (Emphasis in original.) *People v. Easley*, 192 Ill. 2d 307, 324, 736 N.E.2d 975, 988 (2000). Indeed, nearly any race-neutral reason will suffice at the second stage, even those which are arbitrary, irrational, or silly. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

¶ 48 The third step in the *Batson* inquiry requires an evaluation of the prosecutor's credibility. Where the race-neutral reason for a challenge invokes a juror's demeanor, such as hesitancy, the trial court's firsthand observations are "of crucial importance." *Davis*, 231 Ill. 2d at 363-64. "In such situations, the trial court must evaluate not only whether the prosecutor's demeanor belies discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.* at 364.

¶ 49          "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* at 363. A reviewing court defers to the trial court's judgment and will not disturb its *Batson* ruling unless it is clearly erroneous. *Id.* at 364. A determination is clearly erroneous when a review of the entire record leaves the reviewing court with the "definite and firm conviction that a mistake has been made." *People v. Payne*, 2015 IL App (2d) 120856, ¶ 43, 40 N.E.3d 43 (citing *Hernandez*, 500 U.S. at 369).

¶ 50          In this case, it is not arguable defendant's direct appeal would have been successful. Because it is not at issue whether defendant presented a *prima facie* case, had defendant's appellate counsel raised the *Batson* issue on direct appeal, the trial court's decision to deny defendant's *Batson* challenges would not have been reversed unless this court found the decision to be clearly erroneous. See *Davis*, 231 Ill. 2d at 364. When the trial court denied defendant's *Batson* challenges, it accepted the race-neutral explanations for each of the State's peremptory challenges. Nothing in the record demonstrates the court's acceptance of the State's race-neutral explanations was clearly erroneous. *Id.*

¶ 51          Defendant specifically highlights the State's race-neutral explanation for its peremptory challenge of juror Taylor. The State's proffered reason for excluding Taylor was she may "view the defendant favorably" because her son was in a similar situation when he was convicted of kidnapping. Defendant argues Taylor had been rehabilitated because she stated her son had been treated fairly and that four non-Black selected jurors also "had relatives who had been involved in or accused of criminal activity." This argument misrepresents the State's proffered race-neutral reason for excluding Taylor. The State did not exclude Taylor because a family member was "involved in or accused of criminal activity" but rather because her son, *as a young person*, was convicted of kidnapping. The State clearly proffered its concern Taylor may

- 13 -

compare her son's situation with defendant's situation and, in the State's words, "view the defendant favorably."

¶ 52      The State further explained it chose to use a peremptory strike on Taylor due to her "casual description of her son's conviction of kidnapping was as though it was not a very serious offense." This demonstrates why we give great deference to the trial court's determination. Unlike the cold record we are limited to on review, the trial court had the opportunity to view Taylor's demeanor and hear her tone while describing her son's conviction. Based on the court's observations of Taylor, and the State's proffered basis, the court determined the State's concern Taylor did not treat a serious offense, kidnapping, as a serious matter was founded. The appellate court will not disturb the trial court's decision on this matter where nothing in the record demonstrates it was in error, much less clearly erroneous. *Davis*, 231 Ill. 2d at 364.

¶ 53      Similarly, the trial court's acceptance of the State's proffered reasons for jurors Palmer, Allen, and Walker also was not clearly erroneous. Palmer agreed she would feel the need to explain her verdict to defendant's mother and it would make her "uncomfortable." Even though Palmer stated it would "not impact" her during trial, it was reasonable for the State to conclude Palmer's relationship with defendant's family could, consciously or unconsciously, influence her decisions as a juror. Allen seemed confused as to whether she would hold the State to a higher standard based on defendant's age. The State had to clarify the standard of proof before Allen agreed she would not hold it to a higher standard than reasonable doubt. Further, Allen agreed she was "iffy" on whether anything would cause her difficulty judging the conduct of another person. The State's concerns of her ability to be a fair and impartial juror were a reasonable explanation for her requested removal. Finally, Walker, despite the confusion as to

whether he was to be removed for cause, was related to a defendant Assistant State's Attorney Kroncke had prosecuted. Kroncke specifically recalled the sentencing hearing in Walker's nephew's case was "heavily contested" and the family was "upset" with the sentence. Walker stated he was not present for the hearing, but it is entirely reasonable for the State to presume Walker's connection to a contentious hearing could influence his decision-making as a juror. Therefore, the State's proffered reasons for the removal of Palmer, Allen, and Walker were all plausible, and we will not find the trial court clearly erred in accepting the State's reasoning. *Davis*, 231 Ill. 2d at 363-64.

¶ 54 We find defendant's *Batson* claim had no arguable merit on appeal. Therefore, appellate counsel cannot be ineffective for failing to raise it on direct appeal. See *Edwards*, 195 Ill. 2d at 163-64. As it is not arguable appellate counsel was ineffective on direct appeal, the trial court did not err in finding defendant's postconviction petition was frivolous and patently without merit. *Hodges*, 234 Ill. 2d at 17.

¶ 55 III. CONCLUSION

¶ 56 For the reasons stated, we affirm the trial court's judgment.

¶ 57 Affirmed.